Filed 12/4/25  Estate of Barbour CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| Estate of BARBARA BARBOUR, Deceased. | |
| RALPH CARDINALE, Petitioner and Appellant, v. ANTHONY BARBOUR, et al., Objectors and Respondents. | A170303 (Contra Costa County Super. Ct. No. MSP21-01093) |

At issue in this appeal is the meaning of a one-page, typewritten will executed by a wife, Barbara, a small business owner who predeceased her second husband, Michael.[1]  After having been married for 20 years, the couple executed similar wills on the same date in 2002 in the back room of one of their businesses.

The question concerns the meaning of Barbara's will.  Specifically, did she devise all her assets to her surviving husband Michael, so he could pass them to *his* named heirs when he died?  Or, did her will devise him in effect a

---

[1] For clarity and convenience, we refer to Barbara, Michael and the primary parties to this appeal (Ralph and Anthony) by their first names, since some of them share the same last name.

1

life estate and her brother Ralph half of any of the couple's assets remaining when Michael died. The trial court ruled that Barbara's will is unambiguous and was intended to leave all Barbara's assets to Michael if he survived her, which he did, and nothing to Ralph in that circumstance. It conditionally admitted, and then excluded, the extrinsic evidence offered to prove a contrary meaning.

We disagree with the trial court and reverse. Applying de novo review, we conclude Barbara's will is ambiguous. It is reasonably susceptible to the interpretation adopted by the trial court, but also to the interpretation that if Michael survived her, he could use her half of the assets as he needed or wished during his lifetime, but when he died her half of any remaining community assets would go to her brother, Ralph, and Michael's half would pass (through his own will) to his son and two of his siblings. Because the will is ambiguous, the trial court erred by excluding the extrinsic evidence—which includes statements Barbara made about her testamentary intent, statements Michael made about their joint intent in her presence and other circumstances surrounding the couple's simultaneous making of their wills and reflecting Barbara's intent.

Upon consideration of that extrinsic evidence—which is not in conflict—we further conclude on de novo review that Barbara's will did not disinherit her brother Ralph if she predeceased her husband. Rather, her will left half of all assets in the family estate to Ralph if her husband Michael died first, and if her husband outlived her, which he did, left to Ralph half of any assets remaining in the family estate at the time of Michael's death (with the remaining half going to Michael's heirs). This interpretation serves the goals stated in the Probate Code of effectuating the testator's intent as

2

expressed in the will and giving all provisions of Barabara's will operative effect, not just the isolated sentences the trial court erroneously focused on.

## BACKGROUND

### A. Barbara's Will

Barbara's will is a one-page, typewritten document, witnessed and signed on July 2, 2002.  In full, it states:

"THIS IS MY WILL. I REVOKE ALL PRIOR WILLS AND CODICILS. IN THE EVENT OF MY DEATH I LEAVE ALL OF MY ASSETS, PERSONAL BELONGINGS, BUSINESS INTERESTS, CASH IN BANK ACCOUNTS AND ALL PROPERTY TO MY HUSBAND MICHAEL . . . , WITHOUT CONDITION OF ANY KIND.

"IN THE EVENT MY HUSBAND MICHAEL DOES NOT SURVIVE ME I LEAVE MY HALF OF OUR FAMILY ESTATE TO MY BROTHER RALPH . . . . IN ITS ENTIRETY. NO OTHER PERSONS, RELATIVES OR OTHERWISE ARE TO RECEIVE ANY PART OF MY ESTATE.  MY FIFTY PERCENT OF OUR COMBINED FAMILY ESTATE IS WILLED TO MY BROTHER RALPH JOHN CARDANA(AKA.RALPH JOHN CARDINALE)

"EXECUTOR [¶] I NOMINATE GERALD FOLLETT AS FIRST CHOICE AS EXECUTOR. IF FIRST CHOICE DOES NOT SERVE, THEN I NOMINATE RALPH JOHN CARDANA(AKA.RALPH JOHN CARDINALE) AS EXECUTOR. NO BOND SHALL BE REQUIRED OF WHO EVER IS EXECUTOR.

"I INSTRUCT EXECUTOR TO LIQUIDATE ALL ASSETS INTO CASH AND DISTRIBUTE MY HALF TO MY BROTHER RALPH JOHN CARDANA (AKA.CARDINALE)."

### B. Family Background and Circumstances Leading Up to Barbara's Execution of Her Will.

Barbara met and began dating Michael in the early 1970's shortly after her first husband, a Hayward police officer, died on duty in a car accident. Michael, also a Hayward police officer, was assigned to help Barbara with her husband's funeral. Barbara used the proceeds of the life insurance she received after her first husband's death to purchase a townhouse and a small business in Hayward known as Bottle & Book, a combined liquor and bookstore. She and Michael began dating soon after they met and married about a decade after that, in 1982, when Michael was 40, and Barbara, 34.

The couple operated Bottle & Book as a team and over time bought five other small businesses, including a bar and lounge called Artie's, of which they were particularly proud. Barbara managed the employees and front-end operations, and Michael handled the finances. They were proud of the businesses they built together.

Barbara had no children, but she was very close to her younger brother, Ralph, who began working for her at Bottle & Book in the early 1970's after completing his military service. Ralph continued to work with Barbara and Michael there, as well as at some of their other businesses, until 1986, when he moved to Virginia.

Even after Ralph moved, he and Barbara remained close. They spoke almost every Sunday and talked about everything. They also emailed, texted and communicated on Facebook Messenger. Ralph visited Barbara and Michael in California at least once a year, and Barbara visited him in Virginia several times. Ralph and his husband also vacationed with Barbara and Michael many times.

Michael also had a good relationship with Ralph. When Ralph opened a flower shop in 2002, Michael advised him how to set up the books and do

4

the buying.  Ralph and Michael communicated "once or twice a week, sometimes three times" a week during that period.  And the couple twice loaned Ralph money, which he repaid.

Ralph testified that Barbara first talked with him about her estate plan in 1999 or 2000, when she was visiting him and his husband in Virginia.  At the time, Ralph and his husband were having difficulty obtaining a loan on their home because at that time, in Virginia, two men could not legally be on title.  Barbara told him he "needed to remember that I was to receive half of their estate when she passed" and "that everything would be all right."  She was referring to her and Michael's estate.  Ralph was surprised but happy.

Michael had a son, Anthony, from a prior marriage.  Anthony had become addicted to drugs, and Michael was disappointed in him because he hadn't made anything of his life.  Barbara had a strained relationship with Anthony, who rarely visited and upset her when he did.  When Barbara talked about Anthony, she was angry or upset.  Barbara "wasn't real happy" with Anthony because she and Michael had bought three cars for him and he'd wrecked all of them.  Anthony once called the bar and asked to talk to Michael, and after an employee told Anthony he wasn't there and gave him Michael's home number, Michael told him not to do that again because he didn't want Anthony calling him at home.

According to a neighbor and close friend of Barbara's who testified, Karen McDonald, when Anthony was expected to visit Michael and Barbara on occasional Christmases, Barbara acted stressed and disturbed and prepared her home to keep things away from Anthony and his partner.  She locked up and hid her jewelry and locked up medication, saying they stole from her and she didn't feel safe having them in the house.

### C. Execution of Barbara's and Michael's Wills

Barbara and Michael executed typewritten wills in the back room at Artie's bar on July 2, 2002. We have quoted Barbara's in full above; Michael's contains similar provisions, including some that are substantively identical.[2]

There is no direct evidence as to how the two wills were prepared, by whom or when. The circumstances and the documents themselves, however, indicate they were prepared together by Michael, Barbara or both of them, at or around the same time and without the assistance of an attorney.[3] Neither

---

[2] In full (except for some omitted full names), it states:

"THIS IS MY WILL. I REVOKE ALL PRIOR WILLS AND CODICILS. IN THE EVENT OF MY DEATH I LEAVE ALL OF MY ASSETS, PERSONAL BELONGINGS, BUSINESS INTERESTS, CASH IN BANK ACCOUNTS TO MY WIFE BARBARA J. BARBOUR, WITHOUT CONDITIONS OF ANY KIND.

"IN THE EVENT MY WIFE BARBARA DOES NOT SURVIVE ME I LEAVE MY HALF OF OUR FAMILY ESTATE TO THE FOLLOWING PERSONS IN THE INDICATED PERCENTAGES:
1. TO MY SON "ANTHONY . . . ." I LEAVE 70 PERCENT.
2. TO MY SISTER "DIANE M. KNOPF" I LEAVE 15 PERCENT.
3. TO MY HALF BROTHER "GERALD FOLLETT" I LEAVE 15 PERCENT.

"THE THREE PEOPLE ABOVE LISTED ARE THE ONLY ONES I LEAVE ANYTHING TO. ALL OTHER PERSONS, RELATIVES OR OTHERWISE WERE LEFT OUT INTENTIONALLY.

"EXECUTOR [¶] I NOMINATE GERALD FOLLETT AS FIRST CHOICE AS EXECUTOR. IF FIRST CHOICE DOES NOT SERVE, THEN I NOMINATE RALPH . . . AS EXECUTOR. NO BOND SHALL BE REQUIRED OF WHO EVER IS EXECUTOR. [¶] I INSTRUCT EXECUTOR TO LIQUIDATE ALL ASSETS INTO CASH AND DISTRIBUTE SAID CASH TO MY ABOVE LISTED AIRS [*sic*] IN THE PERCENTAGES I INDICATED AFTER THEIR NAMES."

[3] Both wills have the same typeface (i.e., font style and size) and a similar layout, and both are written in all capital letters which is not typical

6

Barbara nor Michael had a college education or any legal training or experience, though Michael "thought he was an attorney" because he had taken the LSAT online.

Charles Brown, a childhood friend of Michael's who worked for Michael and Barbara at Artie's bar, witnessed the signing of their wills, along with a woman named Sandi who did odd jobs for them. Brown signed Barbara's will, and Sandi signed Michael's.

When they were signing the wills, Barbara told Brown she wanted to leave a good portion or a portion of the assets to Ralph. Brown had kidded her, saying, "I know I don't see well, but I don't see my name" in the will. They laughed, and then she said she wanted to leave assets to Ralph.

The day after they signed the wills, Brown, who had been urging Michael to prepare a will, said to Michael, "Well, you finally paid attention to me." Michael responded, "Well, yeah, I did. I got it—I got it done."

### D. Subsequent Conversations About Barbara's and Michael's Intentions Prior to Their Deaths

Ralph testified about a conversation that took place about 15 years later, in 2017, when the first named executor named in both wills, Michael's brother Gerald Follett, passed away. Soon after Follett's death, Ralph flew to California at Barbara and Michael's request. They said they wanted to talk

---

of a document prepared by an attorney. They also have very similar provisions. They contain some legal language that could have been taken from a form. They also contain spacing and punctuation errors, and (in Michael's) "heirs" is misspelled "airs." In addition, each will has one signature line for the testator and only one other signature line for a witness and is signed by a single witness, while the Probate Code generally requires two (see Prob. Code, § 6110, subd. (c)(1)). Failure to comply with the two-signature requirement requires the proponent of a will to prove "by clear and convincing evidence that, at the time the testator signed the will, the testator intended the will to constitute the testator's will" (*id.*, subd. (c)(2)), a requirement not at issue here.

7

with him, and the three sat down at Barbara and Michael's kitchen table. Michael told Ralph that Follett had passed and Ralph was now the executor for both his and Barbara's wills. Michael told Ralph he had Parkinson's disease, and Ralph saw his hand was "shaking real bad." Michael told Ralph he and Barbara wanted all their property to be sold and the proceeds split between Anthony and Ralph.[4] He also said they wanted Anthony "to be put on an allowance of $3,000 a month" because of his history with drug abuse. He was afraid Anthony would kill himself with drugs. Michael wanted Anthony to have a home in Bakersfield, where he lived, in the price range of $300,000 to $350,000. Barbara reminded Ralph that their sister Kathy, from whom she and Ralph were estranged, was not to inherit anything. She said "that everything was to be sold" because she "didn't want any fighting over the property or anything to do with the estate." Michael and Barbara also told Ralph he was supposed to take over as executor "[w]hen they both had passed, but not until." They both mentioned the wills, but Ralph did not see the wills during the conversation. The conversation ended with all of them crying.

Around the same time, in April 2017, Barbara spoke with Karen McDonald about her will. McDonald was a longtime neighbor of Barbara and Michael's who lived across the street and was one of Barbara's closest friends in whom she confided about her family and personal life. McDonald testified that Barbara told her in that conversation that she already had a will in place, that she had put her brother in charge of it and that all her portions of it would go to him. Barbara told McDonald she had come into the relationship with Michael with a lot of money from her previous marriage

---

[4] Michael's will devised his half of the family estate in shares to Anthony (70 percent) and Michael's two siblings (15 percent each).

and didn't want it "dwindled away" and that her portion should go to her family, specifically, Ralph.

A year or two later, in 2018 or 2019, Barbara brought Ralph, who was visiting, to McDonald's house to introduce them. Ralph was admiring McDonald's remodeled kitchen, and Barbara laughed and said, "when I die you'll be able to remodel your kitchen every year with my money."

Michael's niece Doreen Prohaska, Gerald Follett's daughter who used to visit Barbara and Michael twice a year ever since a family reunion that had taken place about 16 or 17 years prior to trial, testified that Barbara discussed her will on several occasions and told her she and "Uncle Mike" had spoken and were going to put Prohaska "in the will." Uncle Mike "was always sick, and we all thought that Uncle Mike wasn't gonna survive." Prohaska also testified that she believed Barbara intended for her brother, Ralph, to receive her share of the estate. This belief was the reason she traveled from Idaho to testify—despite knowing that if Ralph received half of the estate, her own share would be reduced.

In June 2020, Ralph spoke by phone with Barbara after Michael had been admitted to the hospital. Barbara was in pain. Ralph asked her if she had everything in order and if he needed to call an attorney. She told him no and that the wills were in place and asked if he remembered the instructions. They went over the instructions.

Ralph spoke with her again in late June and could tell she was in a lot of pain. Michael was still in the hospital. Part of the time, Barbara was mumbling and not making any sense. She said that they did not have wills. Ralph didn't know what to think and asked if he needed to call an attorney to come out to the house, and she said no.

9

Ralph flew out later in 2020 when Barbara was very ill and in the hospital. Michael was on a lot of medication, was weak, and would walk the floors at night and then sleep a lot during the day. One night around midnight while Ralph was asleep, Michael "came pounding on my door, my bedroom door, and said, You have to get up, you have to get up. We have to count the money." Ralph got up and went downstairs, and Michael said, "we have to count the money. I think there's money missing." They kept a lot of money in the house in toolboxes. Michael said to him, "Well, remember this—half of everything is yours. We've got to count the money. I think there's money missing."

Barbara passed away on August 13, 2020.

After she died, and about a year before his own death, Michael spoke to his longtime friend and employee Brown about leaving part of his estate to his son and nieces (children of the by then deceased siblings named in his will) and part of it to Ralph. He told Brown he had to "take care of Ralph." He was concerned about leaving his son, Anthony, a lump sum and was thinking about leaving him a monthly amount. It is unclear from Brown's testimony whether Michael was thinking of revising his will.

Michael died a little more than a year after his wife, on November 7, 2021.

### E.    Probate Proceedings

Following Barbara's death, Anthony petitioned for conservatorship over Michael, on April 9, 2021. The court granted conservatorship of Michael's person to professional fiduciary Michelle McBee. McBee filed a Spousal Property Petition asserting Michael's right to all assets in Barbara's estate. Ralph opposed the petition on the grounds that Barbara's will was ambiguous.

10

Shortly before Michael died in November 2021, Ralph filed a petition to determine entitlement in Barbara's estate, and on April 15, 2022, he filed a similar petition in Michael's estate. On September 22, 2022, the court granted Ralph's petition for probate, appointed him as executor of Barbara's will and admitted the will to probate.

On January 9, 2023, Ralph filed an amended petition to determine entitlement, asserting that Barbara's will was either ambiguous or should be reformed to reflect her intent. The petition named Anthony and the children of Michael's now deceased siblings as parties entitled to notice. Anthony filed an opposition to the petition on March 9, 2023, joined by Michael's nieces and nephews, who were his other potential heirs and we refer to as "the other heirs."

The court treated Barbara's and Michael's probate matters as related cases. It set a court trial in Barbara's case first, with Michael's case trailing.

The trial in Barbara's case was held over several days in October 2023. Four witnesses, Charles Brown, Ralph, Karen McDonald, and Doreen Prohaska—testified in support of the interpretation advanced by Ralph. No witness testimony was presented for Anthony or the other heirs.

After provisionally hearing the extrinsic evidence offered by Ralph, the court granted Anthony's motion to strike all the testimony based on its view (as urged by Anthony) that Barbara's statements about her intent were irrelevant or otherwise inadmissible because they "did not specifically relate to the language in the Will or to Barbara's intent *at the time the Will was prepared and signed,* which is the only time relevant to interpret the Will." It also held that "[t]he limited documentary evidence introduced by Ralph at trial also did not contradict the unambiguous provisions of the Will and did not explain any alternative meaning in the Will."

11

On April 16, 2024, the trial court issued a final statement of decision and entered judgment in Barbara's probate case. Focusing on two sentences of Barbara's will in isolation, and on the absence of "any language preserving a life estate or limiting Michael's interest upon Barbara's passing," the court ruled Barbara's will is not ambiguous. It ruled that her will clearly and unambiguously provides that if she predeceased Michael, all of her estate would be inherited by Michael, and that Ralph would not "supersede" Michael or inherit her half of the marital estate.

The judgment denied Ralph's amended petition and ordered that all of the assets in Barbara's estate be distributed to Michael's probate estate.

Ralph timely appealed from the judgment.

## DISCUSSION

### I.

### *Standard of Review*

As our high court did in *Estate of Dodge* (1971) 6 Cal.3d 311, 318, "We begin our discussion with a statement of the applicable principles of appellate review. As set forth in *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865, it is 'a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence.' The possibility that conflicting inferences can be drawn from uncontroverted evidence does not relieve the appellate court of its duty independently to interpret the instrument; it is only when the issue turns upon the credibility of extrinsic evidence, or requires resolution of a conflict in that evidence, that the trial court determination is binding. (*Parsons v. Bristol Development Co.*, 62 Cal.2d at p. 866, fn. 2.) These same principles define the appellate function in the construction of wills. (*Estate of Russell* (1968) 69 Cal.2d 200, 212.)" (*Estate of Dodge,* at p. 318, fn. omitted.) Where the record "discloses

12

no conflict in the extrinsic evidence, and no issues of credibility, it becomes our task to arrive at an independent interpretation of the will." (*Ibid*.)

Our first task is to determine whether the will is ambiguous, that is, whether "in the light of both the language of the will and the circumstances under which it was made, the will is reasonably susceptible of more than one interpretation." (*Estate of Dodge*, *supra*, 6 Cal.3d at p. 318.) Unless there is conflicting evidence, this, too, is a question of law we consider de novo. (*Citizens Business Bank v. Carrano* (2010) 189 Cal.App.4th 1200, 1205; accord, *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 [ruling on threshold determination of ambiguity (whether proffered evidence is relevant to prove meaning to which language is reasonably susceptible) is question of law, not fact].)

If we conclude the will is ambiguous, we then proceed to interpret the will, again considering both the language of the will and any relevant extrinsic evidence. (See *Estate of Dodge*, *supra,* 6 Cal.3d at pp. 318, 320.)

Here, the parties disagree as to our standard of review. Ralph urges us to review all issues de novo on the ground there was no conflict in the extrinsic evidence.

Anthony and the other heirs urge us to apply an abuse of discretion standard or review the court's determination for substantial evidence. For example, Anthony characterizes as "ultimate findings" the trial court's determination that the will was not ambiguous which he claims is "supported by substantial evidence." He argues in another section that "there was no abuse of discretion in finding the Will was unambiguous," and in yet another that "the lower court's judgment should be upheld as any substantial evidence that existed at trial to support its judgment would defeat the appeal." He also argues that Ralph waived his "substantial evidence claim"

13

by failing to describe the evidence fairly.  In later sections, Anthony continues to assume the standard of review is substantial evidence or abuse of discretion, ignoring the authorities cited by Ralph and even case law Anthony himself has cited, which hold the issue is one of law unless there is conflicting evidence.  However, he also asserts that "Ralph's extrinsic evidence was contested, conflicted, did not relate to the drafting of the Will, and lacked credibility based on his impeachment" and "lies."[5]  (Italics omitted.)

The other heirs, who filed their own respondents' brief, argue we are bound by the trial court's determination that Barbara's will is unambiguous because it was based on credibility determinations and conflicts in extrinsic evidence.  Apparently in the alternative, they also argue that "[t]here is no extrinsic evidence for the Court to consider of Barbara's intent when the 2002 will was drafted and signed" and therefore the court should apply de novo review to determine Barbara's intent based on "the clear, definite, and unambiguous language of the will."

We agree with Ralph that de novo review applies here, both to the question whether Barbara's will is ambiguous and to the ultimate question as to its meaning.

Anthony's claim that we review the ambiguity and interpretation issues under the abuse of discretion standard lacks any merit.  Anthony cites no case law applying the abuse of discretion standard to issues of ambiguity and interpretation of wills or other instruments, and we are aware of none.

Further, the relevant extrinsic evidence was not in conflict, and so we will review the court's ruling de novo.  Contrary to the other heirs' argument,

---

[5]  He also asserts that Barbara was dishonest and adds the same charge against his father, Michael, without explaining how these accusations have any bearing on the appeal.

14

we are not "bound" by the trial court's holding that the will was unambiguous; nor do we review the court's interpretation of Barbara's will for substantial evidence. Neither Anthony nor the other heirs have pointed to any conflict in the extrinsic evidence, much less one that the trial court resolved and relied on. Ralph presented evidence of the circumstances surrounding Barbara's preparation of her will and her understanding of its meaning. Neither Anthony nor the other heirs presented any testimony on that or any other subject.[6]

Anthony sought to impeach Ralph at trial with a portion of an email from Ralph to Michael's conservator and portions of Ralph's deposition testimony, and on appeal goes to great lengths to portray the extrinsic evidence as "controverted and conflicting" and Ralph's testimony as not credible. He argues this "eliminates any possible *de novo* review by this Court as a matter of law." We have thoroughly reviewed Anthony's assertions, Ralph's responses and the cited portions of the record and find neither any effective impeachment of Ralph[7] nor any conflict in the extrinsic evidence.[8] In addition, there were slight variations in Barbara's statements to third parties, but none conflicted with an interpretation that would entail both a gift of her assets to Michael during Michael's lifetime and a gift to

---

[6] Indeed, one of Michael's nieces, Prohaska, testified on behalf of Ralph, that Barbara intended to leave assets to him.

[7] Anthony quotes portions of his trial counsel's cross-examination of Ralph, none of which demonstrate Ralph was untruthful.

[8] The closest thing to a conflict is that at various points, Barbara told Ralph and others she had a will in place, but near the end of her life when she was in great pain and not entirely coherent she told Ralph she and Michael did not have wills. That is not a conflict in the evidence as to the will's meaning. The parties did not argue, and the trial court did not question, that Barbara and Michael both had wills.

Ralph conditional only on there being assets remaining after she and Michael had both died.  Moreover, the trial court made no reference to any conflicts in the evidence or credibility issues.  Rather, it concluded as a matter of law based on the language of Barbara's will alone that it was unambiguous.[9]

Because the trial court's decision did not entail a resolution of any conflict in the evidence or any issue of credibility, we independently assess whether the will was ambiguous in the sense of being reasonably susceptible to the meaning Ralph has advanced, and if we conclude it is, "it becomes our task to arrive at an independent interpretation of the will." (*Estate of Dodge*, *supra*, 6 Cal.3d at p. 318.)  This means we independently determine the significance of the uncontradicted extrinsic evidence to the meaning of the will.

## II.

### *Interpretation of Barbara's Will*

#### A.    The Parties' Contentions

Ralph argues the trial court erred in finding the will unambiguous and interpreting it without considering the extrinsic evidence.  He contends that the trial court focused exclusively on one paragraph in Barbara's will in isolation and failed to follow principles of interpretation requiring consideration of the document as a whole, construing each part in relation to each other part to form a consistent whole and favoring an interpretation that gives every provision some effect over one that renders some provisions

---

[9] Even in discussing the reformation claim, the court did not mention conflicts in the evidence.  Insofar as Anthony points to the trial court's determination that the evidence was insufficient to show mistake in drafting and a conflict with the testator's actual specific intent at the time the will was drafted, his argument is misplaced.  On appeal, Ralph does not challenge the trial court's ruling on his reformation claim, and such claim entails a different factual showing and is governed by a heightened proof requirement.

16

inoperative. He also contends the trial court erred in striking the extrinsic evidence. He asserts the will is ambiguous, and the extrinsic evidence demonstrates that Barbara and Michael intended to create a joint estate plan effectively giving a life estate to the surviving spouse with the remainder to be divided equally to their respective heirs upon the surviving spouse's death.

Anthony's arguments for the most part fail to address the issues raised in the opening brief and, as we have discussed, misstate the applicable standard of review (see *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465 ["Failure to acknowledge the proper scope of review is a concession of lack of merit"]). In addition, his brief is riddled with "[h]yperbole, exaggeration, belligerence, disrespect and arguments belittling [Anthony's] opponent," which "diminish[es] [any] persuasive force" it might have. (See Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2024) ¶ 9:29, p. 9-9). And the "statement of [the] case" and "factual statement" portions of his brief are argumentative, conclusory, and extremely selective. At bottom, he argues that "[A]ll evidence admitted at trial . . . established Barbara's clear and unambiguous intent: that should she die first, which in fact happened, then Michael would inherit everything from her estate, *without condition of any kind.*" We do not address Anthony's many arguments that have no apparent relevance to the issues on appeal, including his arguments about Ralph's claim for reformation, which Ralph did not raise in his opening brief and expressly disclaimed in his reply brief.

Finally, the other heirs argue that "[t]here is no extrinsic evidence for the Court to consider of Barbara's intent when the 2002 will was drafted and signed" and therefore the court should interpret the will based on its "clear, definite, and unambiguous language." Like Michael, they argue in

17

conclusory terms that the trial court's interpretation of the will is correct and must be upheld but provide no reasoned argument or analysis of the language of the will.

### B.    Legal Principles

As this court explained in *Estate of Cairns* (2010) 188 Cal.App.4th 937, " ' "In construing trust instruments, as in the construction and interpretation of all documents, the duty of the court is to first ascertain and then, if possible, give effect to the intent of the maker." [Citations.]' [Citation.] '[Probate Code] Section 21102 provides, "[T]he intention of the transferor as expressed in the instrument controls the legal effect of the dispositions made in the instrument." ' " (*Id.* at p. 944.)

" ' "In construing a trust instrument, the intent of the trustor prevails and it must be ascertained from the whole of the trust instrument, not just separate parts of it." ' " (*Estate of Cairns, supra,* 188 Cal.App.4th at p. 944; see also *Ammerman v. Callender* (2016) 245 Cal.App.4th 1058, 1074 [" '[I]n ascertaining the intention of the trustor the court is not limited to determining what is meant by any particular phrase but may also consider the necessary implication arising from the language of the instrument as a whole' "].)  "All parts of an instrument are to be construed in relation to each other and so as, if possible, to form a consistent whole." (Prob. Code, § 21121.)

"The words of an instrument are to receive an interpretation that will give every expression some effect, rather than one that would render any of the expressions inoperative.  Preference is to be given to an interpretation of an instrument that will prevent intestacy or failure of a transfer, rather than one that will result in an intestacy or failure of a transfer." (Prob. Code, § 21120.)

"Provisions in a testamentary instrument are to be given a liberal and reasonable interpretation rather than a narrow and technical one, with a view to discovering the decedent's testamentary intent, and the apparent meaning of particular words, phrases and provisions is to be subordinated to the testator's plan or dominant purpose." (*Estate of Cairns, supra,* 188 Cal.App.4th at pp. 947-948.) "The testator's intent cannot be garnered from the technical meaning of one phrase, but only from the will as a whole [citations], and [a] will must be examined 'in the light of the circumstances surrounding its execution so as to ascertain what the parties meant by the words used' (*Estate of Russell* (1968) 69 Cal.2d 200, 208-209.)" (*Estate of Dodge, supra,* 6 Cal.3d at p. 325.) Furthermore, "[t]echnical words are not necessary to give effect to a disposition in an instrument." (Prob. Code, § 21122.)

"Thus the 'context' of a term in a will must also encompass the will as a whole, and the surrounding circumstances and relationships . . . ." (*Estate of Dodge, supra,* 6 Cal.3d at p. 325.) Among the circumstances to be considered are whether the will was prepared by an attorney or a layperson and the extent of the drafter's education. (See *Estate of Geffene* (1969) 1 Cal.App.3d 506, 513.)

### C.    Barbara's Will, Considered As a Whole, Is Ambiguous.

In holding Barbara's will is unambiguous, the trial court focused on two sentences in Barbara's will. First, addressing the sentence stating, "In the event of my death I leave all of my assets . . . to my husband Michael Anthony Barbour, without condition of any kind," the trial court observed, "Nothing about *this provision* is ambiguous." (Italics added.) Second, turning to the next sentence—"In the event my husband Michael does not survive me I leave my half of our family estate to my brother Ralph John Cardana, (AKA.Ralph John Cardinale) in its entirety"—the court stated, "[t]he

19

alternative disposition of Barbara's estate *is based entirely on Barbara surviving Michael*, which did not occur." (Italics added.) Based on these two sentences alone, the trial court held the will was susceptible to only one interpretation.

If this were the entirety of Barbara's will, it would support Anthony's and the other heirs' position, though that interpretation would raise the specter of partial intestacy. (If Barbara had survived Michael and left only her "half of our family estate" to Ralph, would the other half pass by intestacy?) The next sentence underscores that problem, stating, "No other persons, relatives or otherwise are to receive any part of my estate." An interpretation that would result in intestacy is disfavored. (Prob. Code, § 21120.) That, considered along with parallel provisions in Michael's will which raise the same issue, support an inference consistent with the interpretation Ralph advances, that Barbara and Michael intended their wills would operate together such that each would leave his or her half of any remaining estate to his or her designated heirs when both of them had passed.

Two other provisions of the will support the interpretation Ralph urges us to adopt. The next sentence of the will states, "My fifty percent of our combined family estate *is willed* to my brother Ralph . . . ." (Italics added.) This language is unconditional. To imply a condition limiting this devise to the situation in which Barbara survives Michael would violate principles of construction that discourage insertion of terms that have been omitted (Code Civ. Proc., § 1858) and render provisions of a document redundant and inoperative. (Prob. Code, § 21120.)

The directive to the executor in the final portion of the will "to liquidate all assets into cash and distribute my half to my brother Ralph"—again,

unconditionally—likewise supports the interpretation advanced by Ralph, that Barbara and Michael intended to provide the survivor a life estate while allowing each to devise half of any remainder to their designated heirs. To read the will as Anthony and the other heirs suggest would require us to ignore this language and render it inoperative.

In short, Ralph's interpretation of the will would harmonize all of its provisions and treat it as a consistent whole. The gift to Michael if he survived Barbara would be given effect, placing no restrictions on Michael's spending of the assets while he was living. However, that clause would not render redundant and inoperative the sentence, "My fifty percent of our combined family estate *is willed* to my brother Ralph." (Italics added.) The directive to the executor to liquidate all assets in the estate, and distribute Barbara's "half" to Ralph, if interpreted to mean after both spouses had died, would also give effect to that devise and avoid any intestacy and make plain that the devise was of Barbara's half of the family estate as it existed at the time of the surviving spouse's death. There would be no intestacy, because the will would be understood to recognize Michael's will as devising the other half of any remaining assets to *his* heirs upon the surviving spouse's death.

Considering these additional terms of Barbara's will, we conclude the will is ambiguous, that is, it is susceptible of more than one interpretation and specifically the one advanced by Ralph. As explained, it is possible to interpret the will in this way without disregarding the provisions on which the trial court (and Anthony and the other heirs) rely and thereby treat it as "a consistent whole." (Prob. Code, § 21121.) True, the language devising Barbara's assets to Michael "without condition of any kind," is susceptible of the meaning urged by Anthony and the other heirs that Michael could not only spend or use the assets as he wished during his lifetime but could also

21

devise any remaining assets to his own heirs alone without regard to Barbara's. If the will were prepared by a probate or trust attorney, it might well be understood that way. However, neither Barbara nor Michael were attorneys or even had a college education,[10] and the evidence indicates no attorney was involved in drafting their wills.[11] In this circumstance, we do not presume even the broad language they used, whether taken from a legal form or otherwise, was necessarily intended to apply not only to Michael's own use of the assets during his lifetime but also to the disposition of those assets upon his death. (See Prob. Code, § 21122 [technical words are to be considered as having been used in their technical sense unless context indicates contrary intention or it appears will was drawn solely by the transferor and the transferor was unacquainted with the technical sense].)

As we shall discuss further *infra*, the extrinsic evidence sheds light on what Barbara intended by these provisions of the will. Suffice it to say for present purposes that the extrinsic evidence underscores the ambiguity and supports this alternative reading of Barbara's will.

---

[10] Anthony argues the statement in the opening brief that Michael and Barbara were not experienced in the law is a misrepresentation to this court and as evidence that this is false, points to Ralph's testimony that Michael was a police officer, that he took the LSATs and "thought he was an attorney," and that he may have been involved in some "potential criminal activities" in connection with the couple's business. The argument is frivolous and has no place in an appellate brief. Taking the LSAT does not amount to legal experience—far from it. The LSAT is not a test of legal knowledge; it assesses reading comprehension and logical reasoning. (LawHub <https://app.lawhub.org/articles/the-lsat> [as of Dec. 4, 2025].) Nor does experience as a police officer suggest knowledge of law other than basic criminal law. Anthony's counsel's cross-examination of Ralph about Michael having engaged in some unspecified "potential criminal activities" relating to his and Barbara's business is vague and speculative and does not in any event show Michael had any knowledge of probate and trust law.

[11] See footnote 3, *ante*, pp. 6-7.

**D. The Extrinsic Evidence, Which the Trial Court Erroneously Struck, Demonstrates Barbara Intended To Devise Her Half of Any Community Assets Remaining on Michael's Death to Ralph.**

Ralph's interpretation is supported by the extrinsic evidence, which the trial court erroneously struck and declined to consider. Most significantly, there is Michael's own will, drafted in conjunction with Barbara's. It provides that if Barbara does *not* survive him, he leaves "my half of our family estate" to Anthony and his other named "airs." The fact that he only devised *his half* of the estate to his heirs suggests that he and Barbara both intended that Ralph would inherit Barbara's half interest in any assets remaining after Michael died, even if Barbara predeceased him, by virtue of the sentence in her will unconditionally devising her 50 percent to Ralph.

The trial court erred in striking the extrinsic evidence and refusing to consider it in interpreting Barbara's will. It failed to consider Michael's will, prepared and executed at the same time as Barbara's will, despite its obvious bearing on Barbara's understanding of her own will. It also rejected Barbara's statements to third parties about her intentions on the ground that the testimony "did not specifically relate to the language in the Will or to Barbara's intent *at the time the Will was prepared and signed*, which is the only time relevant to interpret the will." This cramped view of the scope of permissible extrinsic evidence is unsupported by any current legal authority; the court cited no authority at all. It is not the law, and it harkens back to a time before the Legislature revised the statutes governing wills and trusts "to carry out more effectively the intent of the decedent who dies leaving a will." (See *Estate of Duke* (2015) 61 Cal.4th 871, 880-886.)

To aid in understanding ambiguous or doubtful language in a testamentary instrument and thereby ascertain the transferor's intent, the common law has long permitted consideration of the surrounding

23

circumstances. (*Ammerman v. Callender, supra,* 245 Cal.App.4th at p. 1074 ["we need to ' " 'consider the circumstances under which the document was made so that the court may be placed in the position of the . . . trustor whose language it is interpreting, in order to determine whether the terms of the document are clear and definite, or ambiguous in some respect' " ' "]; 14 Witkin, Summary of Cal. Law (11th ed. 2017) Wills and Probate, § 204, p. 280.) Under current law, evidence of surrounding circumstances is admissible to prove the existence of an ambiguity. (See *Estate of Russell, supra,* 69 Cal.2d at pp. 208-209 (*Russell*).) As the court recognized in *Russell,* " 'The exclusion of parol evidence regarding [all the] circumstances merely because the words do not appear ambiguous to the reader can easily lead to the attribution to a written instrument of a meaning that was never intended.' [Citation.] 'The court must determine the true meaning of the instrument in the light of the evidence available. It can neither exclude evidence relevant to that determination nor invoke such evidence to write a new or different instrument.' [Citations.] '[W]hen a judge refuses to consider relevant extrinsic evidence on the ground that the meaning of written words is to him plain and clear, his decision is formed by and wholly based upon the completely extrinsic evidence of his own personal education and experience.' " (*Id.* at p. 209.) That is especially problematic when a court is considering a will prepared by individuals who are unschooled in the law and legal terminology.

California law formerly placed restrictions on the admission of extrinsic evidence of a testator's oral declarations as to her intentions (see *Russell, supra,* 69 Cal.2d at pp. 206-207, 211, 212 & fns. 9, 18 [discussing limitations on extrinsic evidence, including former Prob. Code, § 105]; 14 Witkin,

Summary of Cal. Law, *supra,* § 205, p. 280).[12]  Since 1985, however,

"admissibility of the testator's oral declarations [has been] governed by the

general rules of evidence."  (14 Witkin, *supra,* § 205, p. 281.)  "It has been

suggested that the only criteria for the admission of any extrinsic evidence as

an aid in interpretation of ambiguous documents should be its relevancy and

weight."  (*Id.* at p. 282.)[13]

---

[12]  The general rule, "though criticized and subject to exceptions," was
that "if an intention was apparent in the language of the will, it could not be
shown that the testator had a different intention."  (14 Witkin, Summary of
Cal. Law*, supra*, § 205, pp. 280-281.)  The courts adopted numerous
exceptions over the period the rule was in effect, such as admitting a
testator's statements to his or her attorney, or those offered as an aid to
interpretation of an imperfect or uncertain description or to show a latent
ambiguity or to establish his or her testamentary intent.  (*Id.* at p. 281; see
*Estate of White* (1970) 9 Cal.App.3d 194, 201; see, e.g., *In re Fries' Estate*
(1963) 221 Cal.App.2d 725, 730 [oral declarations of testator offered to show
his state of mind concerning meaning of particular language in will that is
ambiguous].)

[13]  See also Rest.3d Property (Wills and Other Donative Transfers)
§ 10.2, com. f ("Direct as well as circumstantial evidence relevant to the
donor's intention may be considered.  Direct evidence relevant to the donor's
intention includes . . . the donor's own declarations of intention, written or
oral; . . . statements made to the donor by the drafting agent or another
concerning the contents or effect of the document, to the extent that the donor
acquiesced, silently or expressly, in the other person's statements");  *id.*,
com. g ("Although the primary focus is on the donor's intention at the time of
execution of the donative document, post-execution events can sometimes be
relevant in determining the donor's intention.  Post-execution statements of
the donor, for example, can relate to the donor's intention at the time of
execution. . . . As with any other circumstance bearing on the donor's
intention, the probative force of post-execution indications of intention must
be weighed by the trier of fact").

Notably, in interpreting contracts, the principles of which now
generally apply to wills (see *Russell, supra*, 69 Cal.2d at pp. 210-212),
consideration of statements by one or both parties after execution are
regularly considered relevant indicia of intent.  (See *Southern Cal. Edison Co.
v. Superior Court* (1995) 37 Cal.App.4th 839, 851 ["[T]he construction given [a

Having concluded that the court erroneously struck Ralph's extrinsic evidence, we now turn to the relevant circumstances. The facts that Barbara and Michael's marriage was a second marriage for both, that Barbara had received substantial life insurance proceeds and invested them in a townhouse and one or more of the businesses she and Michael operated together, that she and Michael worked together to build the many businesses they acquired, that she was proud of the businesses they had built, that in the will and statements to others she referred to her "share," her "portion," her "half" and her "fifty percent" of the "family estate" or "our combined family estate," and that she stated she did not want the money she had brought into the marriage to be "dwindled away" and thought it should go to her family, are strong indicia that Barbara intended to devise her half of the estate to the beneficiary she chose.

There is also undisputed evidence of Barbara's antipathy toward Michael's son Anthony, which Barbara expressed to Ralph and to McDonald, including her belief that he had wasted some of their assets already by wrecking three cars she and Michael had given him and her statement to Ralph that she thought Anthony was a thief. This undisputed evidence suggests she did not intend for her part of the community estate to go to Anthony, ever.

Barbara's intent to devise her share of the assets to Ralph even if Michael survived her is reflected by the fact that Ralph is mentioned four

contract] by the acts and conduct of the parties with knowledge of its terms, and before any controversy has arisen as to its meaning, is admissible on the issue of the parties' intent. [Citation.] . . . [T]his rule is not limited to the joint conduct of the parties. . . . 'The practical interpretation of the contract by one party, evidenced by his words or acts, can be used against him on behalf of the other party, even though that other party had no knowledge of those words or acts when they occurred and did not concur in them' "].)

26

times in her will, including in an unconditional statement "willing" her share of the assets to him. It is further supported by the directive to the executor to "liquidate all assets into cash and distribute my half to my brother Ralph." In addition to these express terms in Barbara's will, her intent is reinforced by the evidence of Barbara's extremely close relationship with Ralph; Ralph's involvement as an employee for 10 to 15 years in her first small business and some of her and Michael's later-acquired businesses; Barbara's and Ralph's regular Sunday telephone calls after he moved to Virginia; Ralph's frequent visits with Barbara and Michael; Ralph's and his husband's many vacations with both of them; and Ralph's calls and visits with each of them close in time to their deaths. This evidence shows Ralph was Barbara's closest (indeed only close[14]) family member and her close confidante and friend and that he also had a strong and positive relationship with Michael.[15] These circumstances, buttressed by Barbara's statements to Charlie, Ralph, and her close friend McDonald, about her intent to leave to her brother Ralph her community share of the assets she had built with Michael, and her expressions of antipathy toward and reluctance to leave anything to Anthony, strongly support a finding that she intended and understood her will would result in her half of any family estate remaining after she and Michael died going to her brother Ralph. While she made most of these statements well after she and Michael executed their wills, no evidence suggests her intention

---

[14] Ralph and Barbara had a sister from whom they had been estranged for 35 years.

[15] On cross-examination, Ralph was asked about an instance in which he called Michael a thief during an argument, but it is plain from their long-term relationship with frequent visits and shared vacations, Michael providing Ralph business advice, and Ralph staying with Michael during his decline from Parkinson's disease, that over the long term the relationship was a close and positive one.

was otherwise in 2002 when she executed her will.  By 2002, 30 years had passed since her first husband had died and she had received the money from his life insurance and acquired or started up her first business, and 20 years had passed since Ralph had begun working for her first business and she and Michael had married.

Finally, there is undisputed evidence that Michael told Ralph in Barbara's presence that he and Barbara wanted all their property to be sold and the proceeds split between Anthony and Ralph and that Ralph was to take over as executor after both of he and Barbara had died, but not until then.  This was the kitchen table discussion that took place after Michael's brother, Gerald Follett, the first choice executor, had died.  That conversation, too, indicates Barbara's intent and understanding that her and Michael's estates would not be probated until both had died and the assets would be split between Barbara's and Michael's designated heirs.

We also note there is *no* extrinsic evidence supporting a determination that Barbara intended to allow her husband, if he outlived her, to devise all of her property to his heirs alone and to omit Ralph, or that she intended under any circumstances to leave Ralph unprovided for.  Not a single conversation or scrap of paper supports that interpretation.

It is possible to harmonize the seemingly conflicting language in Barbara's will by interpreting the clause devising all her assets to Michael as one that is less than absolute and not intended to eliminate her gift to Ralph, which has the benefit of serving what appears to be one of two dominant purposes Barbara had:  to provide for her husband Michael if he survived her and to make a sizeable gift to Ralph when both of them had died regardless of who died first.  This addresses the will in its entirety and interprets it as a consistent whole.  It achieves that without depriving Michael of the ability to

28

devise his share of the couple's remaining assets to the heirs he designated in the shares he designated.  And it avoids possible intestacy under either will.

In light of the extrinsic evidence and the provisions of Barbara's will, we conclude it is possible to read the will as a consistent whole that will give effect to Barbara's intent.  While the will is far from a model of clarity, we read it as best we can through the eyes of a testator who lacked legal experience and, while apparently importing some language from legal forms, was not assisted by an attorney in drafting the will.  Considering what otherwise might be viewed as conflicting provisions of the will, we conclude the sentence leaving all Barbara's assets to her husband Michael "without condition of any kind" was not intended to allow him, if he survived her, to devise her portion of any remaining assets to his heirs alone and exclude Ralph altogether.  Rather, the unconditional sentence at the end of the second paragraph, stating "My fifty percent of our combined family estate is willed to my brother, Ralph John Cardana (AKA.Ralph John Cardinale)," coupled with the directive to the executor in the third paragraph "to liquidate all assets into cash and distribute my half to my brother Ralph John Cardana (AKA.Cardinale)," reflect Barbara's intention that after both spouses died, regardless of who died first, her "fifty percent of our combined family estate" remaining after her own and Michael's deaths was to be distributed to Ralph.  This construction gives effect to all provisions of the will and best reflects the intent Barbara expressed to others both at the time she executed the document (Brown) and at several later times.

Finally, we reject Anthony's and the other heirs' arguments that we should strike Ralph's brief and "deny" his appeal because he allegedly "misstated the record on appeal" or "only discussed evidence favorable to him."  We have considered these arguments and find them meritless.

**DISPOSITION**

We reverse and remand for further proceedings consistent with this opinion.

STEWART, P. J.

We concur.

MILLER, J.

DESAUTELS, J.

*Estate of Barbour* (A170303)